UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

JENNIFER DAUGHERTY,                  )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )        No. 3:17-CV-196
                                     )
COMMUNITY HEALTH SYSTEMS, INC.       )
D/B/A LAFOLLETTE MEDICAL CENTER,     )
                                     )
                    Defendant.       )

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion for Summary Judgment [doc. 17], Defendant's Brief [doc. 18], Plaintiff's Response [doc. 24], Defendant's Reply [doc. 26], Plaintiff's Sur-Reply [doc. 31], and Defendant's Response to Plaintiff's Sur-Reply [doc. 32]. For the reasons herein, the Court will grant Defendant's motion.

## I. BACKGROUND

In January 2013, Defendant Lafollette Medical Center hired Plaintiff Jennifer Daugherty as a patient services representative, [Pl.'s Dep., doc. 17-1, at 2:9–21; 5:1–6; 17:18–20],[1] and during her employment, she received annual copes of an employee handbook, [*id.* at 7:24–25; 8:1–25; 9:1–25; 10:1–7]. The handbook contained various policies including an "Alcohol and Drug-Free Environment/Substance Policy," which prohibits employees from "[b]eing under the influence of any Substance during work

_____

[1] Pincites to the record refer to the electronic page numbers.

hours, or reporting to work with detectable quantities of Substances in their bodies." [Drug-Free Policy, doc. 17-3, at 9]. Under the policy, "cannabinoids (marijuana and hashish)" is a "Substance." [*Id.* at 8].

The policy permits Lafollette to conduct random drug tests on its employees to test them for noncompliance:

> Employees shall be designated as Group 1 or Group 2. Selection of employees will be conducted using a computer random number generator program (www.randomizer.org) or other objective random selection criteria. Those Facilities that have converted to HRIS system will have a radomizer [sic] report built in the system. All employees will have an equal chance of being selected at each testing interval. Random selection shall not be based on individual employee performance, demographic data, or any individualized suspicion of use, being under the influence of, or in possession of Substances. For Group 1 employees, the number of tests conducted annually should be Thirty-Three percent (33%) of the total number of Group 1 employees, (2.75% monthly). For Group 2 employees, the number of tests conducted annually should be Fifty percent (50%) of the total number of Group 2 employees, (4.17% monthly).
>
> Random testing will take place without advance notice. When a randomly selected employee is notified by the Human Resources Department or the immediate supervisor, the employee must proceed immediately as directed to have the test completed.

[*Id.* at 13].[2] Any employee whose drug-test results are positive "shall be separated immediately." [*Id.* at 18]. Ms. Daugherty read this policy. [Pl.'s Dep. at 7:24–25; 8:1–7; 15:13–21]. Throughout her employment with Lafollette, she reviewed the policy every time she received an updated handbook. [*Id.* at 8:8–11; 9:5–7]. She knew that her failure

---

[2] The policy also permits Lafollette to test any employee when it has a "reasonable belief" that the employee is under the influence of drugs, in possession of drugs, or has otherwise violated its policy. [Drug-Free Policy at 12].

to comply with the policy could result in her termination. [*Id.* at 10:18–25; 11:16–25; 12:1–11; 54:12].

In 2015, Ms. Daugherty submitted multiple requests to Lafollette for medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, citing a need to care for her sick mother and to address a personal illness. [*Id.* at 56:22–24; 58:1–11; 66:22–25; 67:1]. Lafollette approved these requests. [*Id.* at 56:22–24; 71:20–25; 72:1–25; 73:1–25; 74:1–25; 75:1–25; 76:1–21].[3] Later, in December 2016, Ms. Daugherty told her supervisor, Donna Carson, that she had suffered an injury to her rotator cuff, [*id.* at 46:22–25; 47:1–25; 48:1–4], which she sustained from "repetition" on the job, [*id.* at 47:24].[4] She informed Ms. Carson of her intent to request workers' compensation and possibly have surgery, [*id.* at 47:1–2], though she never actually submitted a claim for benefits with Lafollete, [*id.* at 50:9–14].

Ms. Daugherty had "some issues" with Ms. Carson and, in her opinion, they were not "the best of friends." [*Id.* at 51:12, 15]. She had a feeling that Ms. Carson "was just looking for a way to get [her] out, for whatever reason." [*Id.* at 51:16–17]. Ms. Carson responded to the news of Ms. Daugherty's injury and the expectation that she would request workers' compensation by saying, "Oh, dear God." [*Id.* at 50:3].

---

[3] Although Lafollette approved these requests, it denied other requests either because a physician had not certified them or because they exceeded the permissible twelve weeks of leave to which the FMLA entitled her. [Pl.'s Dep. at 72:7–25; 73:1; 74:22–25; 75:1; 75:9–19; 76:6–15].

[4] Ms. Daugherty testified that she did not recall the date when she spoke with Ms. Carson in December 2016. [Pl.'s Dep. at 47:3–6].

In January 2017, Ms. Daugherty was one of fifteen employees selected for participation in a drug test. [Drug-Test Spreadsheet, doc. 17-3, at 5–6]. Lafollette printed these fifteen employees' names on a spreadsheet entitled "January Drug Screen 2017." [*Id.* at 5]. On the spreadsheet, various handwritten notations appear beside the employees' names, including beside Ms. Daugherty's name. [*Id.* at 5–6]. The notation next to her name reads: "12–6, Wed." [*Id.* at 6].

The drug test was not Ms. Daugherty's first while in Lafollette's employment; she had been tested on two prior occasions, once in March 2014 and once in April 2016. [Pl.'s Dep. 2, doc. 26-2, at 6:7–22; 7:7–12]. But this time, according John Womack, M.D., who has long served as Lafollette's medical review officer, she tested positive for marijuana. [Test Results, doc. 17-3, at 6; Womack Dep., doc. 17-2, at 18:15–16; 18:10–18; Case Notes, doc. 17-2, at 20]. Based on this positive test, Lafollette elected to terminate her. [Disciplinary Notice, doc. 17-3, at 22].[5]

Ms. Daugherty now brings suit in this Court, claiming that Lafollette's drug test resulted in a "false positive." [Compl., doc. 1-1, ¶ 9]. She maintains that Lafollette really terminated her as a retaliatory measure for requesting medical leave under the FMLA, in violation of 29 U.S.C. § 2615(a)(2). [*Id.* ¶ 17]. Apart from this federal claim, she also brings supplemental claims under state law, including (1) a claim that Lafollette fired her in retaliation for reporting a work-related injury and requesting workers' compensation,

---

[5] Sixteen days after her positive drug test, Ms. Daugherty went to a testing facility and paid for a second drug test, which was negative for marijuana, but she did not bring these test results to Lafollette and request reinstatement. [*Id.* at 59:7–25; 60:1–25; 62:18–25; 63:1–4, 11–19].

in violation of the Tennessee Workers' Compensation Law, Tenn. Code Ann. subsection 50-6-114(a),[6] and (2) a claim for the violation of the Tennessee Drug-Free Workplace Program Act, Tenn. Code Ann. subsections 50-9-106(a)(2)–(3).[7] [*Id.*; Pl.'s Resp. at 15–23]. Lafollette now requests summary judgment on all of these claims.

## II. LEGAL STANDARD

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case

---

[6] Tenn. Code Ann. subsection 50-6-114(a) states: "No contract or agreement, written or implied, or rule, regulation or other device, shall in any manner operate to relieve any employer, in whole or in part, of any obligation" to pay workers compensation benefits under Tennessee law.
[7] Tenn. Code Ann. subsections 50-9-106(a)(2)–(3) contain various conditions and procedural requirements that certain employers must adhere to when testing for drugs in the workplace.

under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

## III. FMLA Retaliatory Discharge

The FMLA entitles employees to an annual total of twelve weeks of leave for numerous reasons including a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). After the employee returns from FMLA leave, the employer must restore her to her position or to an equivalent position. *Id.* § 2614(a)(1). An employer will be subject to civil liability if it "discharge[s] . . . any individual for opposing any practice made unlawful by th[e] [FMLA]." *Id.* § 2615(a)(2); *see id.* § 2617(a)(1).

The familiar *McDonnell Douglas* burden-shifting framework applies to an FMLA retaliation claim, when an employee supports her claim with circumstantial evidence

rather than with direct evidence. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 432–33 (6th Cir. 2014); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012). The term "direct evidence" means evidence that requires "no inferences" to reach a conclusion that FMLA retaliation "was a motivating factor" in the action that the employer initiated against the employee. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (citations omitted). A case that consists of direct evidence is "rare," *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998); it usually surfaces in "cases where the employer makes admissions of a discriminatory or retaliatory motive," *Mikols v. Reed City Power Line Supply Co.*, No. 1:07-CV-84, 2008 WL 2696915, at *4 (W.D. Mich. July 1, 2008) (citing *Imwalle*, 515 F.3d at 544). The record in this case lacks an admission of this sort, and the *McDonnell Douglas* framework therefore applies to Ms. Daugherty's claim of FMLA retaliation.

To establish a prima facie case of retaliation under § 2615(a)(2), an employee has to show that (1) she was engaged in FMLA-protected activity,[8] (2) her employer knew of the protected activity, (3) she suffered an adverse employment action, and (4) a causal nexus existed between the FMLA-protected activity and the adverse employment action. *Seeger*, 681 F.3d at 283. If the employee satisfies these four elements, then a "mandatory presumption of discrimination is created," *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000) (citation omitted), and the burden shifts to the employer, who must identify a non-discriminatory reason for its actions, *id.*; *Demyanovich*, 747 F.3d at 431. If

---

[8] An FMLA-protected activity includes an employee's statutory right to request and receive up to twelve weeks of FMLA leave. 29 U.S.C. § 2612(a)(1).

the employer carries this burden, the burden returns to the employee, who must show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

### A. Lafollette: Establishing the Absence of a Prima Facie Case

In pursuing summary judgment, Lafollette targets the last element of the analysis, the causal nexus, arguing that Ms. Daugherty "cannot establish there was a causal link between her taking FMLA leave and being terminated for failing a drug test." [Def.'s Br. at 18]. First, Lafollette maintains that the approximate eighteen-month timespan between her requested FMLA leave in 2015 and her termination in 2017 is too remote to establish causation. [*Id.* at 20]. Lafollette's argument on this point is accurate. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 309 (6th Cir. 2016) ("Temporal proximity of more than six months, standing alone, has not been found to support an inference of retaliatory discrimination absent other compelling evidence." (citation omitted)); *Nicholson v. City of Clarksville*, 530 F. App'x 434, 448 (6th Cir. 2013) ("A time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim." (citations omitted)).

Second, Lafollette correctly argues that in a case like this one—when over six months has elapsed between an employee's request for FMLA leave and subsequent termination—that "employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." [Def.'s Br. at 20 (quoting *Basch v. Knoll, Inc.*,

8

619 F. App'x 457, 460 (6th Cir. 2015))]. In this vein, Lafollette asserts that the record is lacking in "such 'other evidence.'" [*Id.* at 21]. It notes that Ms. Daugherty even admitted in her deposition that she could not think of a connection between her requested FMLA leave in 2015 and her termination in 2017, except for a suspicion that her Ms. Carson was trying to invent a reason to discharge her. [*Id.*].

> Q: [This is] a retaliation type FMLA claim that's being filed. So what that would mean is there's some connection between the FMLA and the discharge. I'm trying to figure out from you how you think they're connected.
>
> A: She couldn't fire me while I was on FMLA.
>
> Q: Okay.
>
> A: She could fire me if I failed a drug screen.
>
> Q: Right. Any other connection you can think of?
>
> A: No.
>
> Q: So again, you just believe she was looking for any reason to—
>
> A: I do.
>
> Q: —fire you?
>
> A: (Witness nods head up and down.)

[Pl.'s Dep. at 54:5–20].

The Court agrees that this evidence—which is without other evidence in the record to divorce it from mere speculation—is insufficient to establish a causal nexus for a prima face case. *See Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("To establish a causal connection, a plaintiff must 'proffer evidence sufficient to raise the inference that

her protected activity was *the likely reason* for the adverse action.'" (emphasis added) (quotation omitted)); *cf. Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination." (citation omitted)).

As the movant for summary judgment, Lafollette has therefore met its burden of showing the "absence of evidence to support" Ms. Daugherty's claim in the record. *Celotex*, 477 U.S. at 325. Now, to survive summary judgment, Ms. Daugherty has to identify evidence of a genuine issue of material fact—evidence that would enable a reasonable jury to find in her favor by determining that a causal nexus exists. *Anderson*, 477 U.S. at 248, 257; *see Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) ("On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.").

### B. Ms. Daugherty: Proffering Evidence of a Prima Facie Case

In an effort to satisfy her burden and establish a factual dispute as to the causal nexus, Ms. Daugherty clings to her theory that her drug test was a false positive, citing the "inability of the employer to show that the testing was valid." [Pl.'s Resp. at 21]. At the nub of this theory, she appears to be arguing that Lafollette hatched a scheme to test her for drugs, corrupt her urine sample, and then terminate her—in retaliation for having requested FMLA about eighteen months earlier. To support her position, Ms. Daugherty maintains that her testimony shows Lafollette did not follow protocol when it took

her urine sample because it took one sample instead of a "split" sample. [*Id.* at 19].[9] But the Court's review of her testimony in fact reveals just the opposite—that she believed the test at issue was not different from her past negative tests and even that she had no reason to believe that Lafollete tried to tamper with her sample:

> Q: Specimen collection though, it says split again?
>
> A: Uh-huh, yes.
>
> Q: And again, you don't know what that means?
>
> A: I do not.
>
> Q: But in that case you don't deny that you provided a specimen, and in the same way you had done before, it went in the vial and nothing was different, right?
>
> A: Correct.
>
> . . . .
>
> Q: Okay. I guess I'm trying to figure out do you think Donna Carson in some way messed your test up?
>
> A: I don't know that.
>
> Q: And in fact, you went through the same process you always went through for the collection and so on, right?
>
> A: Uh-huh.
>
> Q: Of your specimen?

_____

[9] Ms. Daugherty asserts that a split sample is "normally required." [Pl.'s Br. at 4]. But in reviewing the Alcohol and Drug-Free Environment/Substance Policy, the Court finds no language that expressly requires Lafollette to collect two samples. [Drug-Free Policy at 14 ("All Substance testing (other than post-accident, fitness for duty, reasonable suspicion, or follow-up testing) shall be performed on *a* urine sample unless the circumstances require that testing be performed on blood, hair or saliva samples[.]" (emphasis added)]. And although Dr. Womack testified that the purpose of a second sample is to allow testees to challenge results that come from the first sample, he never testified that a split sample is *required*. [Womack Dep. 2, doc. 24, at 53:3–9; 77:4–10].

A: Yes.

Q: And Donna Carson had nothing to do with that, right?

A: To my knowledge, she doesn't.

Q: Right. I mean, the same process was followed as in the other cases you were tested, right?

A: Yes.

Q: And you filled out the chain of custody form that we looked at already?

A: Yes.

[Pl.'s Dep. at 32:10–19; 52:2–19]. This testimony is incontrovertible. She cannot double back on it. *Cf. Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." (citation omitted)).

Next, Ms. Daugherty tries to advance her theory by asserting that Dr. Womack did not "vouch[] for the specimen that was tested" or "verify that two (2) specimens were taken as otherwise represented by the employer in this case." [Pl.'s Resp. at 21]. Along these lines, she cites the testimony of one of Lafollette's employees, Janice Owens. She paraphrases her testimony by stating that "anybody in the Defendant's lab had access to the Plaintiff's drug screen" and "[w]hat anyone else did with the urine sample she could not verify." [Pl.'s Sur-Reply at 2 (citing Owens Dep., doc. 31-2, at 14:4–17; 19:14–23; 24:18–21)]. Although circumstantial evidence like Ms. Owens' testimony can establish the requisite causal nexus, *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012), it is unavailing if it is not "credible" evidence, *Pettit v. Steppingstone, Ctr. for*

*the Potentially Gifted*, 429 F. App'x 524, 533 (6th Cir. 2011) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

Ms. Daugherty's circumstantial evidence is not credible; it is pure conjecture. At best, the fact that any attendee had access to her urine sample may create *some* doubt as to who precisely handled it, but certainly not to the degree that the Court can reasonably infer that Ms. Carson—intent on retaliating against her—either instructed someone to corrupt it or did so herself. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts" (citations omitted)); *Lewis v. Phillip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (requiring the nonmovant to muster "probative evidence" that is "more than mere speculation, conjecture, or fantasy" to survive summary judgment (internal quotation mark and quotation omitted)); *Reid v. Thetford Twp.*, 377 F. Supp. 2d 621, 624 (E.D. Mich. 2005) ("[T]he nonmoving party must do more than raise some doubt as to the existence of a fact[.]"). A need for evidence that amounts to more than mere conjecture is particularly necessary for claims of FMLA retaliation because "the employer's motive *is* an integral part of the analysis." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation omitted); *see Tennial*, 840 F.3d at 308 ("In order to establish such a causal connection, a plaintiff must show some type of retaliatory intent.").

Like Ms. Daugherty's attempt to show that someone adulterated her urine sample, her attempt to establish additional evidence of retaliatory intent is abstract. Her assertion that Ms. Carson was "just looking for a way to get [her] out, for whatever reason" is

13

nothing but her opinion, and the Court cannot liken it to genuine evidence of retaliatory intent. *See Martin v. AutoZone, Inc.*, 411 F. Supp. 2d 872, 878 (S.D. Ohio 2005) (stating that a plaintiff's "subjective beliefs, without more, are simply insufficient to establish" a prima facie case of FMLA retaliation, and they "are patently deficient to withstand [a] motion for summary judgment"); *cf. Chappell*, 803 F.2d at 268 ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination." (citation omitted)).

Although Ms. Daugherty also maintains that her drug test could not truly have been random because one of Lafollette's employees, William Stokes, testified that the randomizer has not selected him for a test in twenty years, [Pl.'s Sur-Reply at 1], she is pushing the Court to make a mammoth inferential leap. The fact that the randomizer has not recently named this specific employee but has twice named Ms. Daugherty since her requested FMLA leave in 2015 does not even suggest to the Court that the process was tainted by retaliatory animus. *Cf. Drake v. Delta Air lines, Inc.*, 216 F. App'x 95, 96–97 (2d Cir. 2007) (affirming the district court's entry of judgment as a matter of law against the plaintiff because his claim that his employer selected him "in a nonrandom fashion for three successive drug tests" consisted of "only speculation as to how [his employer's] random selection system could be manipulated," rather than "evidence demonstrating that it was" manipulated); *see Spellman v. Ohio Dep't of Transp.*, 244 F. Supp. 3d 686, 702 (S.D. Ohio 2017) ("[Plaintiff] presents no evidence indicating that the drug tests were not random or outside the normal terms of her employment."). Besides, Ms. Daugherty testified that she did not consider her most recent selection in January 2017, which

triggered the positive test result that led to her discharge, to be out of the ordinary or inconsistent with Lafollette's policy. [Pl.'s Dep. at 10:11–17]. She cannot backtrack on this testimony now. *Reid*, 790 F.2d at 460.

And lastly, Ms. Daugherty argues that the notation "12–6, Wednesday" beside her name on the spreadsheet, which lists the names of the employees subject to testing, is illustrative of retaliatory intent. [Pl.'s Resp. at 3]. According to Ms. Daugherty, "12–6" must refer to December 6, 2016, and she now claims this is the date when she reported her injury to Ms. Carson. [*Id.* at 3–4; Pl.'s Decl., doc. 24, ¶ 6]. She insists that "12–6" means Lafollette selected her for testing not in January 2017 but on December 6, 2016, in response to learning about her injury, and that her selection was therefore not random but intentional. [Pl.'s Resp. at 3–4; Pl.'s Decl. ¶ 6].

Ms. Daugherty's argument has two gaping flaws. First, Ms. Daugherty previously testified that she could not remember the date when she talked to Ms. Carson about her injury, other than that it was in December 2016. [Pl.'s Dep. at 47:3–6]. Her sudden recollection of this date, for the purpose of defending herself against summary judgment, is insufficient to create a genuine issue of material fact. *Reid*, 790 F.2d at 460. Second, the word "Wednesday" is written next to "12–6." The date December 6, 2016, did not fall on Wednesday but on a Tuesday.

Even a perfunctory review of the spreadsheet establishes beyond an issue of fact that "12–6" refers not to a date of the year but to hours of the day. Similar numerical notations are written beside each employee's name on the spreadsheet. For example, next to the name "Brassfield, Ronald R.," which appears on the spreadsheet, someone wrote the

handwritten notation "Thus. 7p–7a." [Drug-Test Spreadsheet at 5]. These hourly ranges likely refer to shifts or times when the employees would be available for testing.[10] No reasonable jury could accept Ms. Daugherty's argument otherwise.

In sum, even when the Court views the evidence in a light that is most preferential to Ms. Daugherty and draws all reasonable inferences in her favor, she still cannot establish the causal nexus necessary for her prima facie case. Simply, no reasonable jury could return a verdict for her. Lafollete is therefore entitled to summary judgment.[11]

## IV. RETALIATORY DISCHARGE UNDER TENNESSEE LAW

Under Tennessee common law, "an employer may not lawfully discharge an employee for filing a workers' compensation claim," and "[a]n employee who believes that she has been fired for filing a workers' compensation claim may bring a claim for retaliatory discharge." *Yardley v. Hosp. Housekeeping Sys., LLC*, 470 S.W.3d 800, 804 (Tenn. 2015) (citations omitted). With this type of claim, a prima-facie showing of retaliatory discharge consists of four elements: (1) the plaintiff suffered an injury while

---

[10] Lafollette's policy requires employees to submit to testing "during th[eir] shift[s]." [Drug-Free Policy at 13].

[11] The Court would be remiss if it did not mention that Ms. Daugherty, by affidavit, maintains that Lafollette began writing her up for excessive absences after she requested FMLA leave. [Pl.'s Decl. ¶ 5; Pl.'s Resp. at 3]. But Ms. Daugherty does nothing more than recite this fact to the Court, without making any legal argument based on it. The Court is under no obligation to knead this fact into a material issue on Ms. Daugherty's behalf. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").

in the defendant's employment; (2) the plaintiff made a claim for workers' compensation benefits against the defendant; (3) the defendant terminated the plaintiff; and (4) the plaintiff's request for workers' compensation benefits was a "substantial factor" that led to the defendant's decision to terminate the plaintiff. *Id.* at 805 (citation omitted).

As an initial matter, the Court notes Ms. Daugherty's assertion that "Tennessee courts follow the *McDonnell-Douglas* burden-shifting framework when deciding retaliatory discharge claims." [Pl.'s Resp. at 17]. This assertion is too simplistic and only partially true. In Tennessee, the legislature and the judiciary have created two claims for retaliatory discharge: one for statutory retaliatory discharge and one for common-law retaliatory discharge. *See Williams v. City of Burns*, 465 S.W.3d 96, 110–11 (Tenn. 2015); *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535–37 (Tenn. 2002). Of the two, only the statutory rendition requires application of the *McDonnell Douglas* framework. *See* Tenn. Code Ann. § 50-1-304(f); Tenn. Code Ann. § 4-21-311(e); *Williams*, 465 S.W.3d at 112 n.11.

Although Ms. Daugherty alleges that her retaliatory discharge claim arises under the Workers' Compensation Law, specifically Tenn. Code Ann. subsection 50-6-114(a), the Tennessee Supreme Court has held that this statute does "not explicitly create[]" a means by which employees can bring a statutory claim for retaliatory discharge. *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984). But it did hold that this statute, for public policy reasons, give rise to a common-law claim for retaliatory discharge:

> In our opinion, a cause of action for retaliatory discharge, although not explicitly created by the statute, is necessary to enforce the duty of the employer, to secure the rights of the employee and to carry out the intention

17

of the legislature. A statute need not expressly state what is necessarily implied in order to render it effectual.

*Id.* (citations omitted). The Tennessee Supreme Court recently reiterated that a claim for retaliatory discharge under this statute derives from the common law and not the statute itself. *See Williams*, 465 S.W.3d 96 at 108–09 ("Tennessee has recognized a common-law claim for retaliatory discharge where an employee . . . . was discharged for enforcing her rights under workers' compensation laws." (citing *Clanton*, 677 S.W.2d at 444–45)).

The proper characterization of Ms. Daugherty's claim as a common-law claim and not a statutory claim is, on its face, an important preliminary matter because, in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010), the Tennessee Supreme Court held that the *McDonnell Douglas* burden-shifting framework is "incompatible" with common-law claims for retaliatory discharge at the summary-judgment stage. *Id.* at 785. In lieu of the *McDonnell Douglas* framework, Tennessee courts now have to resolve common-law retaliatory discharge claims "in accordance with Tennessee Rule of Civil Procedure 56." *Id.* at 786 (citation omitted). But ultimately, for federal courts, the difference in Tennessee law between statutory and common-law retaliatory discharge claims is inconsequential.

Because Tennessee Rule of Civil Procedure 56 is not state substantive law but a procedural rule, the Tennessee Supreme Court's mandate in *Gossett* is not precedent that binds federal courts sitting in Tennessee. *Brabson v. Sears, Roebuck & Co.*, No. 3:14-cv-336, 2016 WL 5947469, at *12 (E.D. Tenn. Oct. 13, 2016); *Boges v. Gen. Motors Co.*, 808 F. Supp. 2d 1043, 1051 (M.D. Tenn. 2011); *see generally Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 437 (2010) ("'Under the *Erie* doctrine,' it is long

settled, 'federal courts sitting in diversity apply state substantive law and federal procedural law.'" (quotation omitted)); *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 744 (6th Cir. 1999) (stating that the *Erie* doctrine applies to cases in which a federal court has supplemental jurisdiction over state claims). So in the end, whether Ms. Daugherty harvests her claim from a statute or from common law, the Court has to show fidelity to the *McDonnell Douglas* framework and its burden-shifting mechanics, which it will apply if Ms. Daugherty succeeds in erecting a prima facie case.

### A. Lafollette: Establishing the Absence of a Prima Facie Case

In pursuing summary judgment, Lafollette again contests the existence of a causal nexus, which, as with Ms. Daugherty's FMLA claim, is part of a prima-face showing for her Tennessee claim. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558–59 (Tenn. 1993), *overruled on other grounds by Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73 (Tenn. 2012) (stating that "[p]roof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury"); *see also Cooper v. Wyndham Vacation Resorts, Inc.*, 570 F. Supp. 2d 981, 985 (M.D. Tenn. 2008) (noting that "[i]n order to meet the substantial factor requirement, a plaintiff must show . . . a causal nexus between the workers' compensation claim and the termination" (citation omitted)).

To prove the causal nexus, Ms. Daugherty may rely on direct evidence, "as where the employer has an established policy" or "where the employer admits the reason for the termination," or instead may rely on "compelling circumstantial evidence." *Thomason*

*v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992) (citations omitted). Any use of circumstantial evidence has to be compelling because a common-law claim for retaliatory discharge constitutes only a "narrow" exception to Tennessee's longstanding employment-at-will doctrine, *Williams*, 465 S.W.3d at 109 (quotation omitted), under which employers are free to terminate an employee "at any time, for any reason, or for no reason at all," *id.* at 108 (citations omitted); *see Mason v. Seaton*, 942 S.W.2d 470, 474 (Tenn. 1997) ("This doctrine recognizes that employers need the freedom to make their own business judgments without interference from the courts.").

When relying on circumstantial evidence of causation, an employee usually has to resort to stringing together "numerous forms" of evidence, which may include:

> the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false.

*Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006) (citations omitted). In this case, the record lacks direct evidence of causation, so Ms. Daugherty's claim will hinge on the existence of compelling circumstantial evidence. *See Guy*, 79 S.W.3d at 534 ("[D]irect evidence of [retaliatory] motivation is rarely within the plaintiff's possession." (citation omitted)).

In attempting to establish the absence of a causal nexus in the record, Lafollette highlights Ms. Daugherty's testimony, in which Ms. Daugherty bases her claim of

retaliation on the fact that Lafollete terminated her after she had divulged her shoulder injury to Ms. Carson:

> Q: Other than the fact that you told, as you remember it, your supervisor about [your injury], what else makes you think [your termination] had anything to do with an injury on your shoulder?
>
> A: That's it.

[Pl.'s Dep. 48:15–18]. Lafollete contends that this circumstantial evidence is insufficient to show a causal nexus between Ms. Daugherty's request for workers' compensation and her termination. [Def.'s Br. at 10–11].

The Court agrees that Ms. Daugherty's testimonial of her circumstantial case of retaliation does not measure up to compelling evidence of a causal nexus. *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) ("[A] plaintiff may not prevail on a wrongful discharge claim merely by showing that a causal connection exists between her on-the-job injury and her subsequent discharge. Instead, the plaintiff must show that her claim for workers' compensation benefits, as opposed to her injury, was the true or substantial reason for her discharge." (citation omitted)); *see also Cooper*, 570 F. Supp. at 985 (stating that compelling circumstantial evidence of "a causal connection between the workers' compensation claim and the termination" requires more than "just the fact that the latter followed the former") (emphasis added) (citing *Frizzell v. Mohawk Indus.*, No. M2004-01598-COA-R3-CV, 2006 WL 1328773, at *3 (Tenn. Ct. App. May 15, 2006))); *Thomason*, 831 S.W.2d at 293 ("[T]o get to the jury, there must be some proof of causation other than the facts showing employment, the exercise of rights under the workers' compensation act, and a subsequent discharge.").

Along these same lines, Ms. Daugherty testified that she never filed a claim for benefits with Lafollete, [Pl.'s Dep. at 50:9–14], further eroding the bearings of a causal nexus between Lafollette's decision to terminate her and her purported exercise of rights under the Workers' Compensation Law, *see Frizzell*, 2006 WL 1328773 at *3 ("The plaintiff must establish the *filing* of the workers' compensation claim is the 'true or substantial reason' for termination." (emphasis added) (quotation omitted)); *Reed*, 4 S.W.3d at 685 ("[T]he plaintiff must show that her *claim* for workers' compensation benefits, as opposed to her injury, was the true or substantial reason for her discharge." (emphasis added) (citation omitted)); *see also Clanton*, 677 S.W.2d at 443 (creating a retaliatory discharge claim in common law for cases "where the cause of the discharge is the employee's *exercise* of rights under the workers' compensation laws" (emphasis added)); *see generally* Tenn. Code Ann. § 50-6-201(b) ("In those cases where the injuries occur as the result of gradual or cumulative events . . . the injured employee or the injured employee's representative shall provide [written] notice of the injury to the employer within (15) days[.]").

Lafollette has clearly satisfied its burden of establishing the "absence of evidence to support" Ms. Daugherty's claim in the record. *Celotex*, 477 U.S. at 325. The Court has no need to reexamine the speculative assertions that Ms. Daugherty has injected into the record up to this point, like her suspicion that Ms. Carson was out to get her. In light of the absence of any other evidence in the record, they are ineffectual in buttressing her retaliatory discharge claim under Tennessee law, for the same reasons that they were ineffectual in fortifying her FMLA claim. *See Newcomb*, 22 S.W.3d at 391 ("[S]ubjective

beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge cannot, in and of themselves, create the requisite causal relationship." (citations omitted)).[12] To survive summary judgment, Ms. Daugherty now has the task of identifying evidence of a genuine issue of material fact—evidence that would enable a reasonable jury to find in her favor by determining that a causal nexus exists. *Anderson*, 477 U.S. at 248, 257; *see Cline*, 206 F.3d at 661.

### B.  Ms. Daugherty: Proffering Evidence of a Prima Facie Case

Attempting to establish a factual dispute as to the causal nexus, Ms. Daugherty underscores the temporal proximity—a period of fifty-two days, by her count—between her discharge and her conversation with Ms. Carson about workers' compensation. [Pl.'s Resp. at 16]. But she also correctly acknowledges that temporal proximity alone, without the presence of other compelling circumstantial evidence, is insufficient to establish a prima facie case. [*Id.*]; *see Conatser v. Clarksville Coca-Cola Bottling, Co.*, 920 S.W.2d 646, 648 (Tenn. 1995) (concluding that a three-week timeframe between an employee's receipt of workers' compensation and his discharge was insufficient evidence of a causal nexus); *Newcomb*, 222 S.W.3d at 368 ("[A]n employee cannot rely on the mere short passage of time between the filing of a workers' compensation claim and subsequent termination to prove a prima facie case of retaliation." (citing *id.*)); *see also Cooper*, 570 F. Supp. 2d at 985 ("[C]ourts have consistently held that temporal proximity between

---

[12] Although Ms. Daugherty testified that Ms. Carson said, "Oh, dear God," in response to learning about her work-related injury, the Court—without additional evidence—cannot possibly tell whether this remark had sympathetic or negative overtones.

the claim and the termination is not by itself sufficient." (citation omitted))). Beyond temporal proximity, Ms. Daugherty presents no glimmer of evidence in the record that undergirds her claim. In fact, she devotes little more than a half-page to defending her prima facie case. [Pl.'s Resp. at 16]. Her failure to dispatch her burden of establishing a prima facie case entitles Lafollete to summary judgment.

## V.    TENN. CODE ANN. § 50-9-106(a)(2)–(3)

Tenn. Code Ann. subsections 50-9-106(a)(2)–(3)—which comprise Tennessee's Drug-Free Workplace Programs Act—contain requirements that certain employers have to follow when testing employees for drugs.[13] They govern "reasonable-suspicion" drug testing and "routine fitness" drug testing, and Ms. Daugherty claims that Lafollette failed to comply with the requirements for these two types of testing when it performed her test in January 2017. Tenn. Code. Ann. § 50-9-106(a)(2), (3). Lafollette, however, maintains that the Drug-Free Workplace Programs Act does not entitle Ms. Daugherty to bring a private right of action. [Def.'s Br. at 24]. The Court agrees with this argument, which Ms. Daugherty does not address in her response.

Under the Drug-Free Workplace Programs Act's plain language, the Tennessee legislature clearly intended enforcement to occur through administrative penalties, not private litigation. *See* Tenn. Code Ann. § 50-9-104(a)(1)–(3) (triggering penalties like

---

[13] The statute applies to a "covered employer," which it defines as "a person or entity that employs a person, is covered by the Workers' Compensation Law, compiled in chapter 6 of this title, maintains a drug-free workplace pursuant to this chapter and includes on the posting required by § 50-9-105 a specific statement that the policy is being implemented pursuant to this chapter." Tenn. Code. Ann.  § 50-9-103(5).

the lack of eligibility to receive discounts and inability to deny workers' compensation benefits). For statutes like this one, which "provide[] for governmental enforcement of its provisions," Tennessee courts are loath to "casually engraft means of enforcement" into them without the legislature's express intent. *Premium Fin. Corp. of Am. v. Crumps Ins. Servs. of Memphis, Inc.*, 978 S.W.2d 91, 94 (Tenn. 1998); *see Thomas & Assocs., Inc., v. Metro. Gov't of Nashville*, No. M2001-00757-COA-R3-CV, 2003 WL 21302974, at *10 (Tenn. Ct. App. June 6, 2003) ("Nothing in the utility relocation statutes expressly grants roadbuilders a private right of action[.]").

At least one federal court has refused to read this legislative intent into the Drug-Free Workplace Programs Act. *See Bone v. CSX Intermodal, Inc.*, No. 01-2245V, 2001 WL 1906279, at *2 (W.D. Tenn. Oct. 11, 2001) ("[T]ennessee's Drug-Free Workplace Program Act does not expressly grant a cause of action to an employee and . . . the legislature did not intend to create a private cause of action."). The Court will follow this precedent, which is consistent with the Drug-Free Workplace Program Act's plain language and with how Tennessee courts have interpreted statutes whose plain language does not confer a private right of action on would-be litigants. *See Premium Fin. Corp. of Am*, 978 S.W.2d at 94; *Thomas & Assocs*, 2003 WL 21302974 at *10. The Court will therefore grant Lafollette's request for summary judgment.

## VI.  CONCLUSION

As the movant for summary judgment, Lafollette meets its burden of establishing the absence of genuine issues of material fact as to all of Ms. Daugherty's claims. It is

therefore entitled to summary judgment. Lafollette's Motion for Summary Judgment [doc. 17] is **GRANTED**. The Clerk of Court is **DIRECTED** to close this case.

      **IT IS SO ORDERED.**

                        ENTER:


                        _____s/ Thomas W. Phillips_____
                        United States District Judge